IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,                  :
                        v.                 : Case No. 3:04-cr-36-KRG-KAP
KEVIN FLOOD,                               :(Case No. 3:11-cv-50-KRG-KAP)
                        Movant             :

## Report and Recommendation

### Recommendation

At docket no. 473, Kevin Flood filed a Motion to Vacate
under 28 U.S.C.§ 2255, challenging the 180 month sentence imposed
on him by this court on November 20, 2007, and affirmed on direct
appeal by the Court of Appeals *sub nom*. United States v. Flood, 339
Fed. Appx. 210 (3d Cir.2009), cert. denied, 130 S.Ct. 2358 (2010).
Having reviewed the record, the government's Reply, docket no.
512, and ancillary pleadings filed by petitioner in this and in
other cases, I recommend that the Motion to Vacate be denied.

### Report

Flood's current imprisonment stems from what began in
2003 as an investigation by the Pennsylvania State Police into
marijuana trafficking in Blair County. After the arrest of Keith
Brubaker in March 2004, the state police persuaded Brubaker to
cooperate in obtaining evidence against Flood by wearing a
recording device and recording several conversations between
Brubaker and Flood and between Brubaker and other individuals
relating to expected shipments of marijuana to Flood's residence.
The state police obtained an anticipatory search warrant for
Flood's residence that was executed on the morning of April 11,

2004. Flood was arrested and 532 pounds of marijuana, cash, and a pistol were seized in his residence. Flood was taken to a nearby state police barracks and questioned before being taken to a state district justice and arraigned on a state complaint. During that time Flood gave an inculpatory statement.

Some time later the United States Attorney adopted the prosecution and Flood was arrested on a federal complaint in November 2004. After I found probable cause that possession with intent to distribute existed the government submitted the matter to a grand jury and obtained an indictment against Flood and four co-defendants, charging them all with conspiracy to distribute more than 100 kilograms of marijuana; Flood was also charged with possession with intent to deliver more than 100 kilograms of marijuana and possession of a firearm after conviction of a felony. Three of the co-defendants, Wayne Vance, Kenneth Hamlin, and Vincent Davis, negotiated plea agreements. Raymond Rabreau, represented by Russ Heiple, Esquire, and Flood, represented by Phil Robertson, Esquire (who had been representing Flood during the pendency of the state prosecution) went to trial.

Pretrial motions by the five defendants consumed most of 2005; Robertson moved at docket no. 71 to quash the indictment and to suppress the statement Flood gave while in custody; both Flood and Rabreau moved to suppress the marijuana and other physical evidence seized during the execution of the search warrant.

2

Flood's suppression motion aimed to suppress the recordings as well. After four days of suppression hearings, docket no. 101, docket no. 102, docket no. 114, docket no. 131, the court rejected the suppression motions in an opinion filed at docket no. 149.

In April 2006, almost at the end of the limitations period from the date of his arrest, Flood filed a *pro se* civil rights complaint against some of the Pennsylvania State Police troopers who participated in his arrest, alleging that they had tortured him during questioning. Flood v. Schaefer, Case No. 3:06-cv-82-KRG-KAP (W.D.Pa.). Flood's efforts to raise in the civil case a claim that the state trooper defendants tampered with the audiotapes used in evidence against him have several times been before this court and the Court of Appeals.

Trial on the criminal charges was scheduled for August 14, 2006, then continued apparently because plea agreements had been reached with all the defendants except Rabreau. An apparent agreement with Flood, who was scheduled to enter a plea on August 9, 2009, broke down. Rabreau moved for a continuance of trial, and trial was scheduled for Flood and Rabreau in September 2006. Robertson then filed a motion for Flood alleging that "the Confidential Informant had complete control over the recording device and tampered with the recordings" and that testing of the audiotapes was necessary. docket no. 187. This led to another delay in trial, and shortly after the court denied Flood's motion

3

for testing of the audiotapes, docket no. 201, Rabreau accused Heiple of ineffectiveness and sought new counsel. This was denied. Then Flood, who apparently again was scheduled to enter a guilty plea in October 2006, accused Robertson of ineffectiveness for failing to successfully seek testing of the audiotapes. Due to Flood's accusations that Robertson was misrepresenting him, Robertson withdrew.

William McCabe, Esq., an experienced CJA panel counsel, was then appointed for Flood. McCabe obtained independent transcriptions of the copies of the tapes supplied to him, and in April 2007 filed a second pretrial motion attacking the tapes' authenticity and accuracy and objecting to any attempt by the prosecution's witnesses to use their transcripts or recollections to characterize the contents of the tapes. docket no. 302. Rabreau and Flood eventually proceeded to trial in May 2007. At the outset of trial the court held a Starks hearing, docket no. 372, Transcript of Starks hearing, and ruled again that there was no real issue of the authenticity of the tapes. docket no. 327.

Midway through the criminal trial, Flood claimed that the tapes played to the jury differed from his recollection of them, writing a note to the court during trial implying that the tapes had been tampered with at some point after Robertson turned his copy of the tapes over to McCabe. Motion to Vacate, Exhibit 14; also docket no. 184-1 in the civil case; also docket no. 173

4

in the civil case at 42 (Exhibit C at 1, to Attachment A, a handwritten note dated May 11, 2007, and Exhibit D, an excerpt from a complaint of judicial misconduct dated December 5, 2007). There were two alleged deletions: 1) an exchange during a recorded phone conversation on tape 7 between Brubaker and Hamlin in which someone says "knock him out" and 2) a statement on tape "9 or 10" by Flood, after he snorts some drug in Brubaker's presence, that "'I've got to stop doing this s---t' or something close to that." Motion to Vacate Exhibit 14; also docket no. 173 in the civil case at 18 (Attachment A at 4). Allegedly Judge Gibson then gave orders that the defense could not raise the issue and ordered the Marshal to use a taser on Flood if he spoke without his lawyer. docket no. 173 in the civil case at 18 (Attachment A at 4).

Flood took the stand in his own defense, not discussing his tape tampering claims nor elaborating on his pretrial theory that Brubaker was a government agent who incapacitated him with drugs, but repeating his pretrial claims that Brubaker supplied him with marijuana and oxycontin, that the marijuana deliveries were Brubaker's idea, and that the bales of marijuana were brought into his residence by Brubaker and Hamlin without his knowledge or consent while he was incapacitated by drugs given to him by Brubaker back pain shortly before the police burst in. To defuse the challenge from the evidence of his tape recorded conversations on cross-examination, Flood did not make a tape tampering claim but

5

explained that the prosecution's recorded evidence of him arranging marijuana deliveries was him stringing Brubaker along in order to obtain drugs and not seriously intended to promote any real conspiracy. docket no. 382, Trial Transcript May 14, 2007 at 153-201, particularly 174-75. The firearm found in Flood's garage and the bullets found in his dresser drawer had to have been planted there by Vance. docket no. 383, Trial Transcript May 15, 2007 at 23-49, particularly 32-34. Flood was convicted on all three counts.

After the trial Flood unsuccessfully sought to discharge McCabe and obtain new counsel, including by attempting to have McCabe prosecuted for conspiring with Robertson and "the government," and Heiple, to tamper with the evidence. Motion to Vacate, Exhibit 16, Exhibit 17, Exhibit 20. Flood filed a *pro se* interlocutory appeal of the denial of his motion for a change of counsel, asserting that McCabe was defending the persons responsible for covering up "the crimes of tampering with evidence" and Judge Gibson was condoning it. docket no. 395. Flood also filed a parallel petition for a writ of mandamus at No. 07-3783..

Several weeks before the scheduled sentencing in November 2007, McCabe filed a third motion challenging the authenticity of the tapes and seeking to have the tapes tested, at docket no. 411. The court denied the motion as already litigated at docket no. 417. Flood then filed a *pro se* interlocutory appeal challenging this

denial, and apparently a complaint of judicial misconduct as well, accusing Judge Gibson of "covering these crimes up," and asking for a stay of the sentencing pending an investigation. docket no. 421.

Regardless of the denial of the third motion for testing that sought testing of the tapes played at trial, shortly before sentencing McCabe sent **his** copy of the tape that Flood said had been altered to Roger Boyell, a forensic analyst. Motion to Vacate, Exhibit 12; docket no. 184 in the civil case at Exhibit D (November 14, 2007 correspondence from McCabe to Boyell). The analyst wrote back to counsel that the copy of the tape he received was "defective" and there appeared to be an artifact (or artefact) similar to "the stop-start signature at the beginning of the conversation" that "may or may not indicate editing was performed, and that the signal was "too weak to extract meaningful information." Boyell said that for proper analysis he would "need an accurate and complete 1:1 copy of the original recording." Motion to Vacate, Exhibit 12; docket no. 184 in the civil case at Exhibit D (November 16, 2007 email correspondence from Boyell to McCabe).

After sentencing, McCabe moved to withdraw as counsel due to the breakdown in his relationship with Flood, and James Brink, Esquire, was appointed to represent Flood in the direct appeal. Brink raised several alleged pretrial, trial, and sentencing errors on direct appeal, including a claim that the audiotapes should have

been tested before trial to determine whether they were tampered with. The specific theory advanced by Brink on Flood's behalf, see Electronic 1st Step Brief on behalf of Appellant at 46-47, filed December 12, 2008 in United States v. Flood, No. 07-4479, was that Brubaker was an "unsavory character" and Flood had a reasonable belief that "Brubaker, acting either alone or [in] conjunction with the police, **may have** (my emphasis) altered" the tapes. This claim covered only two pages of the brief and the "may have" quoted above was not fleshed out any further but from looking through the record it is apparent that Brink was challenging Judge Gibson's denial at docket no. 201 of Robertson's motion at docket no. 187 on the grounds that the motion was untimely. (In the end the trial was continued.) I infer that Brink was also suggesting the same thing McCabe's questioning suggested at the Starks hearing, that the tapes were unreliable because Brubaker could have covered the microphone or been out of range at crucial points of the conversation.

Whatever the precise intent of Brink's discussion, a panel of the Court of Appeals affirmed Judge Gibson's ruling:

We agree with the District Court that by filing his motion in an untimely manner and failing to provide a basis for believing that testing was necessary, Flood waived his right to request testing. However, even if we were to look to the merits of Flood's arguments, we agree with the District Court that the authenticity and accuracy of the evidence precluded the need to authorize funding for expert testing. Flood has fallen far short of rebutting the presumption that the evidence in question was authentic; nor has Flood carried his burden of showing that the denial of testing unfairly disadvantaged his case or that expert

8

testimony would have been necessary to present an adequate defense. *See United States v. Stewart,* 104 F.3d 1377, 1383 (D.C.Cir.1997); *United States v. One Feather,* 702 F.2d 736, 738 (8th Cir.1983). Accordingly, we hold that the District Court did not abuse its discretion in denying Flood's motion to test the audio evidence.

United States v. Flood, 339 Fed. Appx. at 214. docket no. 461. Brink did not separately raise nor did the Court of Appeals consider Flood's mid-trial and subsequent claims that the tapes had been tampered with by persons other than Brubaker, that is in the post-arrest and pretrial period.

Since that time, Flood has been to the Court of Appeals at least twice more for writs of mandamus in the civil case and in the criminal case to have the original tapes tested, No. 12-3115 and No. 12-3655, as well as filing motions in this court alleging with varying degrees of civility that persons unknown, or Judge Gibson, or AUSA John Valkovci, Jr. (the government's trial counsel), or the two in conspiracy to protect the state police defendants in the civil case (the "Pennsylvania boys," docket no. 198 in the civil case at 7), or Robertson, or McCabe, or all of them together, tampered with the audiotapes. Flood has alleged that McCabe told him that audiotapes were tampered with by Judge Gibson and AUSA Valkovci, that "they get away with it all the time," and that Judge Gibson and Valkovci were blackmailing him so that counsel could neither defend plaintiff nor withdraw from the case. See e.g. docket no. 173 in the civil case at 16 (Attachment A at 2); see also docket no.

9

198 in the civil case at ¶10.  Flood also has alleged that prior

to trial of the criminal case but after the filing of the civil

case, that is in 2006, Robertson told Flood that he took the

tapes he received from the government under Rule 16 back to the

Pennsylvania state police troopers sued in the civil case so

that they could make the deletions in the tapes before turning

them over to McCabe, and then Robertson bragged to Flood that

Judge Gibson would prevent any testing of the audiotapes and

that even if there were testing Flood would never be able to

detect the deletions.  docket no. 198 in the civil case at ¶7,

¶9.

By contrast, after Flood's direct appeal had resulted

in 2009 in the above-quoted opinion affirming his conviction and

Brink had withdrawn, Flood stated in his September 16, 2009 pro

se petition for rehearing en banc that the tapes were accurate

when he first listened to them and that he only learned about

the tampering in his review of the tapes with McCabe "just

before" trial, that is in 2007.  See Petition for Rehearing En

Banc and before Original Panel at 2, 4, filed September 16, 2009

in United States v. Flood, No. 07-4479.  And in this motion,

Flood earnestly asserts that the reason counsel were ineffective

is that they did not use the alleged sealing violation to obtain

testing that would have disclosed the tampering that he

10

discovered, apparently independently, "two days before trial commenced." Motion at i.

In the Motion to Vacate now before the court Flood makes four claims of ineffective assistance of counsel, see Strickland v. Washington, 466 U.S. 668 (1984) (stating the elements of a claim of ineffective assistance of counsel under the Sixth Amendment), some with subparts, that are written out on the Table of Contents page but can be described as: 1) counsel failed to move to suppress audiotapes used in the prosecution on the grounds that they were not sealed as required by 18 U.S.C.§ 2518(8)(a) and (10)(a) "and use the issue for testing," and refused to test the tapes timely under Rule 16, and "use the violation for testing"; 2) counsel failed to prove that the audiotapes were tampered with and not sealed in violation of 18 U.S.C.§ 2518 and use that to obtain suppression of the evidence obtained in the execution of the search warrant; 3) counsel "misrepresented" Flood in the motion to quash the indictment; and 4) counsel failed to call witnesses at the suppression hearing who would have contradicted the government's version of Flood's interrogation after his arrest. docket no. 473 at ¶12 and Table of Contents.

Before discussing the law and applying it to the record, I note that all four of the claims literally construed would apply only to Robertson, since all of the actions or

11

inactions described were relevant to the period before Robertson withdrew. Reading the motion itself shows that Flood does not however limit his discussion to the claim advanced but, as in his oral communications, wanders and circles around several well-worn themes indicating that he also intends to assert McCabe's ineffectiveness, and implicitly Brink's ineffectiveness in not preserving any claims that were or should have been raised earlier.

To prove a claim under Strickland, Flood must show that counsel's performance was deficient, that is that "counsel's representation fell below an objective standard of reasonableness." Id. at 688. The law presumes that counsel was effective:

Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel's was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

Id. at 689 (internal citations and quotations omitted). There is no one correct trial strategy. Id.; Lewis v. Mazurkiewicz, 915 F.2d 106, 115 (3d Cir.1990)("[W]hether or not some other

12

strategy would have ultimately proved more successful, counsel's advice was reasonable and must therefore be sustained.") The Court of Appeals for the Third Circuit has explained that it is "only the rare claim of ineffective assistance of counsel that should succeed under the properly deferential standard to be applied in scrutinizing counsel's performance." United States v. Kauffman, 109 F.3d 186, 190 (3d Cir.1997)(quoting United States v. Gray, 878 F.2d 702, 711 (3d Cir.1989)).

Flood must also show that he was prejudiced by the deficient performance. "This requires showing that counsel's errors were so serious as to deprive the [the petitioner] of a fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 687. To establish prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. The test is not whether a court can be certain counsel's error had no effect, but rather whether it is reasonably likely that the result would have been different. Harrington v. Richter, 562 U.S. ___; 131 S.Ct. 770, 792 (2011).

In a motion to vacate or habeas petition the petitioner must even at the pleading stage state specific facts, or cite to the place in the record or describe the nonrecord

13

evidence that "point to a real possibility of constitutional error." See Mayle v. Felix, 545 U.S. 644, 655-56 (2005)(quoting the Advisory Committee Notes to Rule 4 of the Rules Governing Section 2254 Cases in the United States District Courts). Specific allegations that give rise to a plausible claim deserve a hearing. No matter how vociferously repeated, mere accusations do not. The Supreme Court has recently restated the principle that habeas corpus under 28 U.S.C.§ 2254 is a guard against extreme malfunctions in the state criminal justice system, not a substitute for ordinary error correction through appeal, Harrington v. Richter, 562 U.S. ___; 131 S.Ct. 770, 786 (2011). Although the federalism concerns behind Harrington do not apply to motions to vacate, motions under Section 2255 are just like habeas corpus petitions in their extraordinary character. Because a motion to vacate is not just a "second bite at the appeal," a petitioner ought to advance specific and credible allegations detailing the nature and circumstances of a charge of a deliberate manipulation of the integrity of criminal proceedings by counsel in order to deserve a hearing. During the pendency of his Motion to Vacate Flood has repeatedly raised arguments in this court and in the Court of Appeals that discovery is appropriate to assist Flood in proving his principal claim that the audiotapes used in his trial were tampered with. Out of an abundance of caution I reiterate my

14

position that Flood's attempts to re-examine the evidence presented at trial, based only on his assertion that there are discrepancies between what he recalls and what was on the tapes, is improper.  To obtain discovery under Rule 6(a) of the Rules Governing Section 2255 Proceedings, a movant must show "good cause."  And see Harris v. Nelson, 394 U.S. 286, 300 (1969)(holding that while automatic discovery under the Fed.R.Civ.P. is not appropriate in habeas corpus, discovery could be left to the discretion of the trial court because "We do not assume that courts in the exercise of their discretion will pursue or authorize pursuit of all allegations presented to them. We are aware that confinement sometimes induces fantasy which has its basis in the paranoia of prison rather than in fact.").  Good cause for discovery exists when the motion establishes a *prima facie* case for relief by specific allegations showing reason to believe petitioner may be able to demonstrate that he is entitled to relief.  Bracy v. Gramley, 520 U.S. 899, 908-09 (1997)(proof that trial judge was convicted of bribery and that judge appointed petitioner's trial counsel from a law practice that was complicit in judge's bribery scheme was sufficient cause to warrant further discovery about tampering in petitioner's case)

What Bracy and Harris do not mean is that if the movant alleges facts that if proved true would invalidate his

conviction, he is entitled to discovery in support of that claim. That is, a defendant cannot make a naked allegation that evidence at trial was falsified any more than he could baldly allege that the appellate panel that affirmed the conviction was bribed and expect rehearing *en banc*. A defendant convicted of possessing cocaine who asserts in a motion to vacate that the substance introduced in evidence was in fact powdered sugar and the lab results were faked does not get to re-test the evidence or to conduct belated discovery about the credentials of the police laboratory. See Jackson v. United States, 2009 WL 3248100 *4 (N.D.WV.2009). This is so, notwithstanding the statement of the obvious by a majority of the Supreme Court in Melendez-Diaz v. Massachusetts, 557 U.S. 305, 319 (2009), that "[s]erious deficiencies have been found in the forensic evidence used in criminal trials."

I have not found a case where the Third Circuit has tackled this issue directly but Zilich v Reid, 36 F.3d 317 (3d Cir.1994) illuminates the issue. There, a petitioner in a habeas corpus matter alleged that he entered a plea to a child molesting charge only because his attorney promised that the judge could be bribed for $4000.00 to guarantee a probationary sentence. The state courts, despite holding evidentiary hearings at which some witnesses testified in a manner supporting the claim that defense counsel had solicited a

$4000.00 bribe, denied relief without reaching the merits of the claim. The district court read the record and also denied relief on the merits; the Court of Appeals vacated and remanded, holding that the specific and supported allegations that a bribe was solicited by counsel required an evidentiary hearing. As relevant to Flood's case, the Court of Appeals noted the exceptional nature of the case:

Nor do we hold that every habeas corpus petitioner is entitled to a hearing in federal court merely because the petitioner has made certain allegations that, if true, would entitle him or her to relief.

36 F.3d at 322.

Other courts have ruled in similar fashion. In the Fourth Circuit, a defendant who moved to vacate on the grounds that jurors were tampered with or influenced by news reports was not given leave to interview the jurors. United States v. Roane, 378 F.3d 382, 402-04 (4th Cir.2004), cert. denied, 546 U.S. 810 (2005). That is so notwithstanding that if the jury were tampered with, the defendant would certainly be entitled to a new trial.

Another example, from the District of Maryland, is the case of a defendant alleging that his defense counsel withheld a plea offer from him that was far more favorable than the result at trial. If the allegation were true it would certainly establish ineffective assistance of counsel, but even an allegation that defense counsel told the defendant that there

was a plea offer did not give the defendant a basis for conducting discovery of the government's file to see if the government's denial of ever offering a plea was true. <u>Gilchrist v. United States</u>, 2012 WL 4520469, *12 (D.Md. 2012).

The standard does not change because petitioner embeds his claim of evidence tampering in a claim of ineffective assistance of counsel. Counsel may properly rely on information supplied by the client in determining the nature and scope of the pretrial investigation and the selection of a defense strategy at trial. <u>Lewis v. Mazurkiewicz</u>, <u>supra</u>, 915 F.2d at 111 and 113. A necessary implication of the concept of assistance of counsel is that counsel take information supplied to them and make an independent judgment; defense counsel are not obliged to raise every claim on appeal, to pursue every potential defense or to undertake what seems to be meritless investigation even if a defendant insists on it. <u>Smith v. Robbins</u>, 528 U.S. 259, 288 (2000)(counsel need not and should not raise every nonfrivolous claim on appeal, but may select the most promising).

Turning to the specific issues Flood raises in his motion, Brink, McCabe, and Robertson did not raise a claim that the sealing requirements of 18 U.S.C.§ 2518(8)(a)("such recordings shall be made available to the judge issuing such [intercept] order and sealed under his [her in this case]

18

directions") or Section 2518(10)(a) were violated for the obvious reason that the recordings were made due to the efforts of state police acting under state law pursuant to a state court order, months before there was any federal involvement. By its express terms Section 2518(1) applies the requirements of the section only to interceptions "under this chapter" and the recordings were not made in a federal investigation.

The intercepted communications were obtained pursuant to an order issued by a state court judge, see Motion to Vacate, Exhibit 27, who directed that under Pennsylvania's Wiretapping and Electronic Surveillance Control Act, 18 Pa.C.S.§ 5704(2), custody of any resulting original tapes was the responsibility of David Gorman, the District Attorney of Blair County. In the Starks hearing Trooper Schaefer testified that that was in fact done, that the tapes were placed in the D.A.'s safe "until the case was taken over by the Federal Government," and at that point Schaefer took them and put them in a "locked closet" in his office until they were brought to court, where he examined them and detected no signs of tampering. docket no. 372, Transcript of Starks hearing, at 15-16, 21. Flood's counsel at the time, McCabe, and Rabreau's counsel, Heiple, both cross-examined Schaefer about the possibility of Brubaker covering up the microphone to interfere with the contents of the recording and also the possibility of stopping the tape during a

19

conversation to omit a phrase. Dennis Drake, the trooper who
made work copies of the tapes from the originals (the copies
that were used by the AUSA to provide copies to defense counsel
in discovery) also testified about the process he used to make
copies and stated that the copying process neither added nor
deleted anything. McCabe and Heiple both cross-examined Drake
about the possibility of recorder failure and human error, and
also established that Drake had not compared the copies with the
originals. Transcript of Starks hearing at 39-46.

As the government notes in its Reply to the motion to
vacate, if there had been a violation of state law in the
preservation of the tapes that would not have rendered the tapes
inadmissable in a federal prosecution, so there would have been
no point in McCabe (or Heiple) exploring the requirements of the
Pennsylvania Wiretapping and Electronic Surveillance Control
Act. Even if a state law violation were relevant the testimony
from the Starks hearing indicates no serious claim that there
was a violation of state law or the state judge's order. Flood
insists that Schaefer's retrieval of the tapes from the D.A. and
the retention of custody by the Pennsylvania State Police
pending trial was a blatant violation of law, but despite the
decibel level of his complaints he cites no law that this is so.
In short, even if a violation of state law would have helped

McCabe make an argument either for suppression or testing of the audiotapes, there was nothing for him to go on.

Further, one must consider what Flood's theory of tape tampering, leaving aside the changing tapestry of characters allegedly responsible, really is. Flood's Motion to vacate asserts that there were helpful statements on the original tapes. Those helpful statements had therefore been on the work copies made by Drake from the originals because they were on the copies supplied to Robertson and heard by Flood before the tapes were turned over to McCabe. At some point, according to Flood perhaps as late as two days before trial, someone deleted the helpful statements from the original tapes played at trial and at some point also surreptitiously retrieved the copies given to McCabe (and it is important to note, to Heiple and perhaps even the three attorneys for the other three defendants who also received Rule 16 material) and deleted the exact same statements. The only attorneys who could have pursued this theory were McCabe and Brink, and Flood points to nothing in the record for them to go on except his mid-trial revelation that he believed that there had been tampering. McCabe was not obliged to treat Flood's recollection as better than his own. Flood's written work and the transcripts give a hint of but do not do justice to how Flood's rambling style sounds in person, and compared to Robertson and McCabe, I only recall Flood from the

initial appearance and detention proceedings before me. Even disregarding what judgment Robertson, McCabe, or Brink may have made, in general an attorney may but is not obliged to explore a claim with no other evidence to support it than a client's insistence. See Florida v. Nixon, 543 U.S. 175, 187 (2004)(An attorney has authority to manage most aspects of the defense without the client's approval, except for the decisions how to plead, the choice of jury or bench trial, to testify, and to take an appeal.)

McCabe nevertheless did send the one tape Flood insisted was altered to an expert, who gave an inconclusive report. Flood argues that Boyell's email is conclusive proof of tampering, but that is a faulty reading. And it is important to keep in mind that the tape sent to Boyell was Flood's (that is Robertson/McCabe's) copy of the tape played at trial, not the tape played at trial itself. McCabe cannot be colorably accused of ineffectiveness for failing to press Flood's claim, in the form it took in mid-2007, any further. Nor can Brink be reasonably accused of ineffectiveness for choosing to advance a version of the pretrial Starks claim that the tapes were unreliable because of Brubaker and choosing not to set out in the appellate brief Flood's complex mid- and post-trial claim of tampering by Robertson, McCabe, Schaefer, Valkovci, and even Heiple.

Flood's third claim is titled "Counsel was ineffective while he misrepresented petitioner in the Motion to Quash the Indictment" suggesting that it focuses on Robertson's motion to quash the indictment at docket no. 71. The Motion itself then lists a grab bag of arguments, including that Robertson was ineffective for failing to discover the tape tampering Flood insists happened (and in some places alleges that Robertson participated in), and that Robertson failed to call various witnesses, including Brubaker and co-defendants Vance and Hamlin, that Flood insists had helpful testimony. These witnesses testified against Flood at trial.

Robertson's Motion to Quash alleged that Brubaker, acting as a government agent, had deliberately supplied Flood with controlled substances that rendered him incapacitated, and then had planted drugs in his residence. Judge Gibson found as a result of the evidence presented at the suppression hearing that Brubaker did illegally supply Flood with oxycontin and other controlled substances in March and April 2004 but rejected the motion to quash without further evidentiary hearing because the claim of outrageous government conduct, that is that Schaefer and the other troopers knew of this conduct, was conclusory. docket no. 149. Flood nevertheless had the opportunity to develop this theory in the evidentiary hearing on the motion to suppress, and Robertson did in fact explore this

topic, but did not elicit any damning disclosures by Brubaker. See docket no. 131, November 30, 2005 Suppression Hearing Transcript. Nor did any of the other four defendants' counsel whose clients would have benefitted from proving government knowledge of Brubaker's illegal conduct.

McCabe also cross-examined Brubaker on this defense theory when Brubaker testified at trial. docket no. 377, Trial Transcript May 10, 2007, at 161-202; docket no. 379, Trial Transcript May 11, 2007, at 4-99. McCabe had Brubaker admit that he provided Flood with cocaine, oxycontin, and Heiple established that before March 2004, Brubaker also furnished marijuana, Id. at 31, 33, 79-80, 97-98. No one was able to elicit any evidence from Brubaker (or any other witness) suggesting that any police officer knew of this behavior during the time Brubaker was working as an informant. The jury could form its own opinion of Brubaker's character, but since there was nothing even at trial on which to base a defense of outrageous government conduct, Robertson or McCabe could not be guilty of ineffectiveness in failing to find it in time to present it at the suppression hearing. Flood's logic is clear but flawed: "If counsel would have done what [Flood] directed him to do the outcome of these proceedings would have been different." Motion to Vacate at 25. That is neither the first

element of the Strickland test nor a very accurate way to describe Strickland's second element.

Flood's fourth claim is that Robertson was ineffective for failing to suppress the statements taken after Flood's arrest. Flood's reasoning is again circular: "[H]ad Robertson been effective the outcome and results would have been different." Motion to Vacate at 27. Flood's insistence that he invoked his right to counsel and that he was tortured for hours in a freezing cold police barracks do not support a claim of ineffective assistance of counsel: Flood testified for almost 100 pages at the suppression hearing and told exactly this story. docket no. 102, August 5, 2005 Suppression Hearing Transcript at 235-312. Flood testified about Brubaker plying him with drugs and that he was under the influence of drugs on April 11, 2004, when the troopers broke into his house without a search warrant while Brubaker was throwing bales of marijuana into his house. Trooper Snyder, who arrested Flood and drove him to the police barracks, handcuffed Flood to a chair, except for a bathroom break, for the next 12 hours. Snyder never read him Miranda warnings, and ignored Flood's immediate invocation of his right to counsel, which Flood repeated "15 or 20 times." The rights waiver indicating a time of 12:04 p.m. was falsified: in fact it was "about suppertime and I [Flood] had to go to the bathroom and I was starving and it was freezing in there."

August 5, 2005 Suppression Hearing Transcript at 243.  Flood
went on to tell how Snyder ignored his complaints about the
drugs Brubaker gave him.  Flood told Snyder "Everything you're
saying is coming to me in like slow motion like in a tunnel, and
it feels like something is pulling me down into the ground.  And
I want to go to the hospital right now and I want my blood
tested." id. at 244.  Trooper Zimmerman and Snyder both ignored
Flood's invocation of his right to counsel.  Flood could not
remember the specifics of his statements because "Keith
[Brubaker] knocked me out with something and hauled a bunch of
crap in my house and I don't know what all I said, but I know I
was pretty upset because it was freezing in there.  It was
freezing cold and it was just ridiculous, you know." id. at
246-47.  The troopers kept coercing his statement by confining
him in a building without heat and not letting him go to the
hospital which he needed because, as Flood told an unknown
friendly trooper who came in at one point, "I need to go to the
hospital, I'm having really bad medical problems on the drugs
this guy gave me.  And I want a lawyer..." id. at 247-48.
Flood chipped his teeth because it was so cold, but he didn't
seek medical treatment because the "Blair County Jail was a
dungeon, it was filthy and it was a dungeon, I wasn't about to
go to no dentist in there." id. at 268.  The drugs Brubaker
gave Flood made Flood drowsy but "I couldn't sleep in there [at

the barracks], it was 30 degrees below when they had me in the interrogating room, it was unbearably cold, there is no way I could go [to] sleep, it was torture." id. at 289.

Flood now claims that if Robertson had: 1) offered for judicial notice the temperature that day; 2) offered a photograph Flood claims was made of him during his interrogation; or 3) called Rabreau as a witness, the outcome of the suppression hearing "would have been different." I find it hard to believe that although Judge Gibson was unconvinced by 100 pages of Flood he would have changed his mind if despite Judge Gibson's familiarity with the weather in western Pennsylvania he had been given an outside air temperature reading for Easter Sunday 2004 or a picture of Flood. I note that Flood did introduce the weather data for the day of his arrest as part of his defense at trial, docket no. 382 Trial Transcript May 15, 2007 at 70, and the trial jury obviously did not find it significant either. Flood says there were other witnesses that had personal knowledge of the cold temperatures in the building, but other than Rabreau does not even now say who they were or how Robertson would have been aware of them. As for Rabreau, it is unlikely that Heiple, who did not call Rabreau in his own suppression efforts, would not have prevented Robertson from calling Rabreau.

The Motion to Vacate should be denied.

27

Pursuant to 28 U.S.C.§ 636(b)(1), the parties are given notice that they have fourteen days to serve and file written objections to this Report and Recommendation.

DATE: 6 March 2014

Keith A. Pesto,
United States Magistrate Judge

Notice to counsel of record by ECF and by U.S. Mail to:

Kevin P. Flood, Reg. No. 11130-068
F.C.I. Terminal Island
P.O. Box 3007
San Pedro, CA 90731